# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No. CR15-4058-LTS |
| vs. | **ORDER** |
| CESAR RAMOS, | |
| Defendant. | |

This matter is before me on a motion for new trial (Doc. No. 76) filed by defendant Cesar Ramos. Ramos filed a supporting brief (Doc. No. 79) and the Government filed a resistance (Doc. No. 83). The motion is fully submitted.

## I. RELEVANT BACKGROUND

On September 23, 2015, the grand jury returned an indictment (Doc. No. 1) charging Ramos with three counts of making a material false declaration under oath. Doc. No. 1. On January 27, 2016, Ramos filed a motion to dismiss, which I denied on March 23, 2016. Doc. Nos. 13, 41. On April 5, 2016, I entered an order denying in part and granting in part the parties' motions in limine.[1] Doc. No. 58. The case then proceeded to trial. On April 12, 2016, the jury returned a verdict of guilty on all counts. Ramos filed his motion for new trial on May 24, 2016.

---

[1] I also denied Ramos' subsequent motion in limine, which was essentially a request to reconsider my previous ruling. Doc. Nos. 63, 64. The motions filed before trial raised various issues that are not relevant to the present motion for a new trial. Similarly, my ruling regarding the parties' proposed jury instructions (Doc. No. 59) is not relevant to the present motion.

## II. MOTION FOR A NEW TRIAL STANDARD

Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "Although the district court possesses broa[d] discretion to grant a new trial under Rule 33, it must exercise the Rule 33 authority sparingly and with caution." *United States v. McClellon*, 578 F.3d 846, 857 (8th Cir. 2009) (internal citations omitted). "Unless the district court ultimately determines that a miscarriage of justice will occur, the jury's verdict must be allowed to stand." *United States v. Campos*, 306 F.3d 577, 579 (8th Cir. 2002).

## III. DISCUSSION

Ramos' sole argument is that the Government violated *Batson v. Kentucky*, 476 U.S. 79, 100 (1986), when it struck potential juror Michael Rodriguez.

### A. *Applicable Standards*

> The "Constitution forbids striking even a single prospective juror for a discriminatory purpose." *Snyder v. Louisiana*, 552 U.S. 472, 478, 128 S.Ct. 1203, 170 L.Ed.2d 175 (2008) (internal quotation marks omitted).

*Foster v. Chatman*, --- U.S. ---, 136 S. Ct. 1737, 1747 (2016). Specifically, "[t]he Fourteenth Amendment prohibits the use of peremptory challenges to strike jurors solely on the basis of race." *United States v. Warren*, 788 F.3d 805, 812 (8th Cir.), *cert. denied*, 136 S. Ct. 349 (2015) (citing *Batson*, 476 U.S. at 85).

> A *Batson* challenge requires a three-step, burden-shifting analysis." *United States v. Jones*, 245 F.3d 990, 992 (8th Cir. 2001). "First, the opponent of a peremptory strike must make a prima facie case of racial discrimination." *Id.* "The burden of production then shifts to the proponent of the strike, who must tender a race-neutral explanation." *Id.* "Finally, if a race-neutral explanation is presented, the trial court must determine whether the opponent of the strike has proven purposeful racial discrimination." *Id.* Trial courts "play a critical role during a *Batson*

> challenge," including "viewing the jurors' demeanor, which can be a race-neutral justification in the exercise of a peremptory challenge." *United States v. Young*, 753 F.3d 757, 780 (8th Cir. 2014). "These determinations of demeanor … are exclusively within the province of the trial court." *Id*.

*United States v. Hawkins*, 796 F.3d 843, 864 (8th Cir. 2015).

The first step is the simplest *Batson* step, as the circumstances surrounding the use of peremptory strikes may give rise to an inference of a discriminatory purpose. *Johnson v. California*, 545 U.S. 162, 173 (2005). A defendant can make a *prima facie* case by demonstrating that the Government directed its challenges at members of a particular race. *See Moran v. Clarke*, 443 F.3d 646, 651 (8th Cir. 2006) ("the attempt to strike all black members of the venire and no one else raises an inference of a discriminatory purpose") (citing *Green v. Travis*, 414 F.3d 288, 299 (2d Cir. 2005)). However, simply stating that a member of a particular group was struck does not establish a *prima facie* case: "Although the number of African–Americans struck is relevant to determining whether a defendant has made a *prima facie* case, that evidence alone is insufficient to negate or create such a case." *Luckett v. Kemna,* 203 F.3d 1052, 1054 (8th Cir. 2000).

Regarding the second element, the Supreme Court has held that the way a juror acts – his or her demeanor during *voir dire* – can provide a race neutral ground for striking that juror. "[D]eference is especially appropriate where a trial judge has made a finding that an attorney credibly relied on demeanor in exercising a strike." *Snyder v. Louisiana*, 552 U.S. 472, 479 (2008). The Eighth Circuit has stated:

> Passivity, inattentiveness, and confusion are common race neutral reasons for striking jurors. *See, e.g., Young*, 753 F.3d at 780–82. Silence is a similar reason, for it too reflects "body language and demeanor" rather than race, *id*. at 780 n. 7, and a party should not be required to assume the risk of a juror about whom little information has been made available, *see McCurdy v. Montgomery Cnty.*, 240 F.3d 512, 521–22 (6th Cir. 2001).

*United States v. Warren*, 788 F.3d 805, 813 (8th Cir.), *cert. denied*, 136 S. Ct. 349 (2015). In addition:

> "Striking a black panelist for reasons that apply 'just as well to an otherwise-similar nonblack who is permitted to serve' is evidence tending to prove purposeful discrimination." *Edwards v. Roper*, 688 F.3d 449, 454 (8th Cir. 2012), quoting *Miller–El v. Dretke*, 545 U.S. 231, 241, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005). Yet, this court has upheld the use of "very fine" distinctions between jurors. *United States v. Morrison*, 594 F.3d 626, 630, 633 (8th Cir. 2010) (affirming strike of black juror because she had not been forthcoming about family member's legal troubles and because her husband had drinking problem, while white juror served whose son had four DWI offenses), citing *United States v. Davis*, 154 F.3d 772, 781 (8th Cir.1998) (finding sufficient difference between drug counselor and drug prevention volunteer). *But see Snyder v. Louisiana*, 552 U.S. 472, 480, 483, 128 S.Ct. 1203, 170 L.Ed.2d 175 (2008) ("implausibility" of striking black juror with student-teaching obligations who indicated trial would cause scheduling conflicts was "reinforced by the prosecutor's acceptance of white jurors who disclosed conflicting obligations that appear to have been at least as serious as" black juror's).

*United States v. Robinson*, 781 F.3d 453, 462 (8th Cir.), *cert. denied*, 136 S. Ct. 596 (2015).

In the final *Batson* element, the court weighs the credibility of the alleged race neutral explanation against the defendant's burden to prove racial discrimination. *See Edwards v. Roper*, 688 F.3d 449, 457 (8th Cir. 2012), stating:

> The denial of a *Batson* challenge, however, "is itself a finding at [*Batson*'s] third step that the defendant failed to carry his burden of establishing that the strike was motivated by purposeful discrimination," *Smulls v. Roper*, 535 F.3d 853, 863 (8th Cir. 2008) (*en banc*), and it "includes an implicit finding that the prosecutor's explanation was credible." *Taylor*, 577 F.3d at 856.

*See also Stenhouse v. Hobbs*, 631 F.3d 888, 893 (8th Cir. 2011), stating:

> The lack of an explicit third-step analysis by the state courts is not contrary to, or an unreasonable application of, any decision of the Supreme Court. Stenhouse points to *Purkett v. Elem*, 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (*per curiam*), where the Supreme Court held that, at step two of the *Batson* process, courts should not reject a prosecution's proffered reasons as unpersuasive. *Id.* at 768, 115 S.Ct. 1769. This

4

practice, the Court explained, improperly combines steps two and three, and "violates the principle that the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Id*.

## B.  *Arguments*

Ramos relies on the recent Supreme Court case of *Foster v. Chatman*, --- U.S. ---, 136 S. Ct. 1737, 1747 (2016), and the recent Eighth Circuit case of *United States v. House*, --- F.3d ---, 2016 WL 3144735, at *2 (8th Cir. Apr. 14, 2016). He argues:

> A review of that transcript reflects the fact that – at page 66, the very first person that the U.S. Attorney Fairchild speaks with is Mr. Rodriguez. This shows his intention to focus on Mr. Rodriguez as the only Hispanic in the jury. Secondly, Mr. Fairchild goes beyond the mere voir dire process and actually cross-examines Mr. Rodriguez. He criticizes Mr. Rodriguez in front of the other jurors . . . This . . . shows a focus, intent and continued pattern to eliminate Mr. Rodriguez from the jury panel. This is what ultimately took place when the prospective jurors were exercised. No other prospective juror was criticized or cross-examined by AUSA Fairchild. . . Defendant renews his Motion for New Trial based upon a clear decision at the outset to eliminate Mr. Rodriguez. The pattern of interrogation, challenge and ultimately the exercise of Mr. Rodriguez as a juror from the panel shows a systematic approach which is contrary to the Batson rule.

Doc. No. 79 at 2. In response, the Government states:

> First, defendant has not made a prima facie showing that a peremptory challenge was exercised on the basis of race (or heritage) at all. While the stricken juror was a person with a traditionally Hispanic or Latin surname, there is no evidence in the record that he was, in fact, of Hispanic or Latin descent. Neither is there any evidence that his fellow jurors were not of Hispanic or Latin descent. . . Second, the prosecution has offered race-neutral reasons for striking the juror in question. The existence of such reasons allow the strike. . . In his questionnaire, the juror refused to answer question [sic] fully, singled his unwillingness or inability to serve on the jury, and suggested (perhaps in an effort to escape jury duty altogether) that he thought it would difficult for him to be a fair and impartial juror. This lack of candor, unwillingness to serve, and either a real or affected biases, suggested in the questionnaire, were race-neutral reasons for striking the

5

juror. [Additionally,] [i]n voir dire, the juror admitted to attempting to nullify a state trial verdict -- that he agreed with factually -- because he thought the resulting punishment was too severe. . . Third, the court must consider, in light of the parties' submissions, whether the defendant has shown purposeful discrimination. He has not. There is no evidence this or any juror was treated differently because of his or her race or appearance. Defendant argues racial animosity was revealed in the selection of the juror as "the very first person that the U.S. Attorney Fairchild speaks with" and the public cross-examining of him. (Defendant's Opening Brief pg. 2). To the contrary, this shows nothing more than the United States had early worries about the juror's ability and willingness to serve on the jury, be fair to the United States, and follow the trial court's instruction. These worries developed from reading the questionnaire and listening to the trial court's – earlier -- colloquy with the juror.

Doc. No. 83 at 8-12.

C. *Relevant Facts*

In his juror questionnaire, Mr. Rodriguez crossed out a question about his past work experience and wrote "what difference does it make?" Doc. No. 85 at 2. Asked about his household he wrote, "I care for [an] elderly parent. She is disabled and I must be there most of the time. She is 85 years old." *Id*. Under the interests section, Mr. Rodriguez stated that he did nothing in his spare time but work and care for his mother, and that what he read, listened to and watched was "none of your business." *Id*. at 3. In the section regarding past contacts he and his family/friends have had with law enforcement, he answered several questions with "are you kidding me?" *Id*. at 4. Finally, he stated that the thinks the judicial system moves too slow, that he could not sit for jury duty, that he has cancer, that he did not have the time to be on a jury and requested that the court excuse him from service. Doc. No. 85 at 5-7.

During *voir dire* I questioned Mr. Rodriguez about his past jury service. He stated that he served on a jury during a state criminal trial for theft. Doc. No. 87 at 55-56. He went onto say that he personally knew the defendant in that case. *Id*. at 56. He stated

that although he thought the defendant was guilty based on the facts, he "drug" out deliberations because he did not want to see the defendant "behind bars." *Id*. He then stated that he eventually voted for a guilty verdict because he was "upsetting everybody" and that he followed what the evidence and the law required. *Id*. at 57.

During the Government's portion of *voir dire*, Mr. Fairchild questioned Mr. Rodriguez further about the same topic. *Id*. at 72-76. Mr. Rodriguez reiterated that he had a problem voting guilty in the state criminal case because he felt the defendant was "a good person" who deserved "some help." *Id*. at 73. Mr. Rodriguez agreed that even though there was no doubt that the defendant had "committed the most serious offense," Mr. Rodriguez thought "for other reasons he should be punished less severely." *Id*. at 76.

Mr. Fairchild ultimately moved to strike Mr. Rodriguez for cause. I denied the request, stating that although "I under[stood] [the Government's] concern," I felt that because Mr. Rodriguez ultimately stated he would follow the court's instructions, striking him for cause would not be appropriate. *Id*. at 86-87. The Government then used one of its peremptory strikes to remove Mr. Rodriguez. Following that strike, Ramos' counsel made a *Batson* challenge and argued that because Ramos is of Hispanic decent, it was improper for the Government to strike Mr. Rodriguez. *Id*. at 103-04. In response, Mr. Fairchild stated:

> First of all, the United States did not consent or acknowledge to the fact that he is, in fact, Hispanic. The record seems to contain only the surname, which could be Hispanic. I am not ready to say that he appears Hispanic to the Government.
>
> Far more importantly, however, in the questionnaire, he responded to several different questions in a way that indicated he didn't want to answer the questions. He asks, at one point, "What different does it" -- "What difference does it make" in response to a question.

7

> Subsequently, he asks on two different questions, "Are you kidding me?" Then he says that he immediately judges scumbags -- or he judges scumbags immediately -- all in his questionnaire.
>
> In addition to those concerns, he asks – or in the voir dire this morning indicated that he came to a conclusion that an individual in State court was, in fact, guilty of an offense. He lobbied against a guilty verdict, however, because he felt there were other reasons to punish the person less severely. And that he yielded that individual judgment not because he didn't think it was right, but because he went along to get along with the other jury.
>
> For all these reasons the Government worries about him as a potential witness [sic].

*Id*. at 104-05. Ramos' counsel responded by providing some reasons as to why, in his opinion, Mr. Rodriguez would be a good juror. *Id*. at 105-06.

I denied the *Batson* challenge. *Id*. at 107. I first noted that it was not the court's role to determine whether Mr. Rodriguez would be a good juror. *Id*. at 106. I then expressed agreement with Mr. Fairchild that it was not at all clear that Mr. Rodriquez was actually of Hispanic descent. *Id*. I then explained that even if Ramos could make a *prima facie* showing of discriminatory intent, the Government provided a neutral, permissible explanation for striking Mr. Rodriguez. *Id*. at 107. While I did not expressly say so, I found the Government's explanation to be credible and determined that Ramos had failed to prove purposeful discrimination.

### D.    *Analysis*

As set out above, a *Batson* challenge is a three step process: (1) the opponent of a peremptory strike must make a *prima facie* showing of discrimination; (2) the proponent of the strike must tender a race neutral explanation; and (3) if a race neutral explanation

is presented, the trial court must determine whether the opponent of the strike has proven purposeful racial discrimination.[2]

While the first step in the *Batson* analysis is usually the easiest, I cannot find that Ramos has met the low bar of establishing a *prima facie* case. As the Government notes, the record does not establish that Mr. Rodriguez is Hispanic.[3] Ramos' argument is that because Mr. Rodriguez has a "Hispanic name" and "Hispanic appearance," he must be Hispanic.[4] Doc. No. 76 at 1. I have severe doubts as to whether mere reliance on stereotypical traits such as an individual's name or appearance is sufficient to show that the individual is, or is not, of Hispanic origin. However, because the Government has clearly established a credible, non-discriminatory reason for striking Mr. Rodriguez, I will assume, without deciding, that Mr. Rodriguez is Hispanic and that Ramos has satisfied the first step of the *Batson* analysis.[5]

The second issue is whether the Government provided a race neutral basis for the strike. Here, the Government has offered numerous neutral grounds for striking Mr. Rodriguez. As discussed above, Mr. Rodriguez acknowledged that when he served as a juror in a prior case, outside influences weighed on him during jury deliberations. He

---

[2] In his brief, Ramos relied on the *Foster* and *House* cases cited above. However, neither case changed or expanded the *Batson* framework in any meaningful way. Nor are the facts of either case particularly similar or relevant to the present case.

[3] Nor is there any evidence about whether or not any other member of the jury panel was Hispanic.

[4] I am troubled by the reference to Mr. Rodriquez' purported "Hispanic appearance." While that is apparently the opinion of Ramos and his counsel, the record contains no reference to Mr. Rodriquez' "appearance." In any event, I do not believe it is appropriate for the court to determine whether an individual has a "Hispanic appearance." As such, I make no finding on this issue.

[5] Similarly, I do not agree with the defendant's allegation that the Government targeted Mr. Rodriguez and "cross-examined" him. There were several well-founded reasons for the Government to start questioning Mr. Rodriguez, including his statements made to the court and his written questionnaire answers.

stated that he argued against a verdict of guilty with regard to the most-serious charge because the defendant was a "good guy" who "needed help," despite the fact that the evidence established the defendant's guilt. He also stated that he ultimately changed his mind, and agreed with a verdict of guilty, because the other jurors were becoming upset with him. The fact that Mr. Rodriguez had previously been on a criminal jury, and had argued for a verdict that was contrary to the evidence, was a legitimate, race neutral reason for the Government to strike him.

Additionally, and perhaps more importantly, Mr. Rodriguez had signaled in his juror questionnaire that he was unable or unwilling to serve on a jury. As noted above, Mr. Rodriguez reported that because of his health concerns and his family and work obligations, he did not have the time to be a juror. He underscored his desire to avoid jury service by answering numerous questions in a flippant manner (such as "are you kidding me?"). Mr. Rodriguez' jury questionnaire responses constitute another legitimate, race neutral reason for the Government to strike him.

Because the Government has offered race neutral explanations for its decision to strike Mr. Rodriguez, the final *Batson* factor asks whether Ramos has shown purposeful racial discrimination. The answer is clearly "no." Quite frankly, based on Mr. Rodriguez's in-court performance and his questionnaire answers, I suspect that most attorneys, regardless of the nature of the case, would have chosen to strike Mr. Rodriguez. He acknowledged that while serving as a juror in a prior case, he relied on an improper reason (his past association with the defendant) to advocate in favor of a verdict that was contrary to the evidence. His questionnaire answers were obnoxious and demonstrated a strong desire to avoid jury service. Accordingly, I find that Ramos has failed, by a very substantial margin, to prove that the Government's decision to strike Mr. Rodriguez was based on Mr. Rodriguez' (alleged) ethnicity.

## IV. CONCLUSION

For the reasons set out above, defendant's motion (Doc. No. 76) for a new trial is **denied**.

**IT IS SO ORDERED.**

**DATED** this 14th day of July, 2016.

_____
LEONARD T. STRAND
UNITED STATES DISTRICT JUDGE